IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| IFS FINANCIAL SERVICES et al, | **MEMORANDUM DECISION AND ORDER** |
| Plaintiffs, | |
| vs. | Case No. 2:13-cv-739 |
| TOUCHSTONE FINANCIAL OF MIDVALE et al | |
| Defendants. | Judge Clark Waddoups |

This matter is before the court on plaintiffs' Motion to Enforce Settlement Agreement (Dkt. No. 50) and defendants' Motion to Dismiss for Failure to State a Claim (Dkt. No. 61) in the plaintiff's Amended Complaint. The court heard oral argument on both motions on May 25, 2016, with attorneys Eric Richardson and Michael Collins representing plaintiffs, and attorney Bradley NyKamp representing defendants. After granting time for additional briefing, the court took the matter under advisement. After careful consideration of the parties' motions, memoranda, and supplemental briefing, the relevant law and the oral arguments of counsel, the court DENIES plaintiffs' motion to enforce the settlement agreement and GRANTS defendants' motion to dismiss plaintiffs' Amended Complaint.

## FACTUAL BACKGROUND

Plaintiffs are the owners of federally registered "Touchstone" trademarks used in connection with financial services, including asset management, investment advice and products, and other forms of financial assistance. In August 2013, plaintiffs brought suit against defendants

1

for allegedly infringing use of plaintiffs' trademarks by marketing a broad range of financial products and services under the names "Touchstone" and "Touchstone Financial," and by using the Touchstone mark in various aspects of their operations. Discovery led plaintiffs to the conclusion that Thomas H. Lee was the owner or part-owner of all allegedly infringing entities and had selected the company names and directed the use of those names in marketing. Furthermore, the plaintiffs discovered that two non-Utah entities affiliated with Mr. Lee were also using the Touchstone name, one in South Dakota and one in Georgia.

In March 2015, the parties began seriously discussing a settlement providing that defendants, including Tom Lee and the non-Utah entities who were then non-parties to the lawsuit, would change their business names and abandon their connections with the Touchstone mark, that they would have a certain period of time in which to accomplish this change, and that each party would bear its own fees and costs. In exchange, plaintiffs would dismiss and release their claims against defendants. (Dkt. No. 50-1). By June 2015, a written settlement proposal fleshing out these basic terms was prepared, and the parties continued to discuss and modify some of the specific details. On August 12, 2015, plaintiffs' counsel sent defendants' counsel a copy of a written settlement agreement incorporating all changes to date, along with the statement, "[a]ssuming these are acceptable, I will start getting copies signed by my clients and would appreciate it if you would do the same." (Dkt. No. 50-2, p. 31). Plaintiffs allege, undisputed by defendants, that counsel spoke on the same day and that defendants' counsel agreed to the most recent changes and "approved the settlement agreement as final." (*Id.* at 4).

Plaintiffs signed the written settlement agreement on August 13, and on August 18 plaintiffs' counsel sent a copy of the signed agreement to defendants' counsel, which was

acknowledged with a "Thank you." (*Id.*). On August 26, plaintiffs' counsel e-mailed defendants' counsel asking when he could expect the document to be returned signed by the defendants. Plaintiffs further allege, again undisputed by defendants, that counsel spoke by telephone on September 1, 2015 about the status of returning a signed agreement. Defendants' counsel allegedly informed plaintiffs' counsel that he expected Tom Lee to sign the agreement on behalf of himself and all of the affected entities by Friday, September 4. (*Id.* at 4-5).

On September 8, having not yet received the signed agreement, plaintiffs' counsel e-mailed defendants' counsel to inquire about its status. By telephone later that day, defendants' counsel responded that defendants had "some non-material changes to the agreement" that he would send. (*Id.* at 5). On September 9, 2015, defendants' counsel e-mailed defendants' "additional thoughts" on the agreement and stated that his clients "would like to incorporate the following changes." The changes included removing Tom Lee individually as a party to the agreement (although he would still sign the agreement as a Class A shareholder for all of the affected entities), eliminating an obligation for defendants to supply an affidavit attesting to compliance with abandoning use of the Touchstone mark, and changing the forum selection clause from Ohio to Utah. (Dkt. No. 50-2, p. 62).

Plaintiffs unequivocally refused to consider any changes to the agreement and threatened litigation to enforce the agreement. (*Id.* at 5-6). Immediately in response, on September 10, 2015 defendants performed the material terms of the agreement, namely submission of the paperwork changing the names of all Utah entities bearing the Touchstone mark. In addition, counsel for defendants informed plaintiffs by e-mail that defendants had begun the paperwork to change the names of the non-Utah entities and had begun the process of changing the associated websites.

This e-mail also stated that "Mr. Lee is making it clear to me that he is not interested in protracting this litigation and has every intent to make the name changes as indicated." (*Id.* at 63). It also stated that this was "really a good faith effort to make the material changes contemplated by the agreement we are negotiating." (*Id.*).

On September 24, 2015, plaintiffs filed a motion for leave to file an amended complaint to add Mr. Lee and the two non-Utah entities as defendants, along with a motion to enforce the settlement agreement. (Dkt. Nos. 49, 50). Defendants opposed the motion to enforce the settlement agreement as moot, indicating that their conduct on September 10 demonstrated they believed an agreement had already been reached, and attaching to their opposition the written Settlement Agreement and Mutual Release signed on October 8, 2015, the same day they filed their opposition memorandum. (Dkt. No. 53).

The signed written agreement required that within ten business days of all parties executing the written settlement agreement, plaintiffs would file with the court a stipulation voluntarily dismissing this civil action. *Settlem. Agrmt. and Mutl. Release*, ¶ 10. Plaintiffs did not do so. The written agreement also set a deadline of November 1, 2015 for defendants to abandon their use of the Touchstone marks, and November 2, 2015 for defendants to supply an affidavit "swearing under penalty of perjury that they have fully satisfied their respective obligations to abandon any use of the Touchstone Marks" as set forth in other sections of the agreement, and "detailing all steps taken to accomplish their compliance." *Id.* at ¶ 7. As previously noted, defendants began complying with these provisions on September 10, and then submitted an affidavit from Tom Lee on November 3, 2015 setting forth his knowledge about steps taken by

the entities to comply with their obligations as outlined in the settlement agreement.[1] (*See* Dkt. No. 63-2, p. 5).

On November 5, 2015, plaintiffs sent a detailed e-mail to defendants outlining five complaints about the compliance set forth in Tom Lee's affidavit:  (1) failure to transfer domain names to plaintiffs (as opposed to abandoning or cancelling them); (2) failure to delete all social media accounts utilizing the Touchstone marks (as opposed to abandoning or discontinuing them); (3) failure to identify the specific names of owners, investors, shareholders, members, partners, and officers who were notified about the requirement to cease use of the Touchstone mark, and the date and means by which they were notified (as opposed to stating that "all managers" were notified by e-mail on September 9 and "shareholders" were notified on October 13); (4) failure to modify the mobile application (as opposed to discontinuing it and stating that the mobile application is no longer being offered); and (5) Tom Lee's failure to personally know (rather than to affirm "upon information and belief" or to his "understanding") that defendants had complied with the terms of the settlement agreement. (*Id.* at 5-6).

Plaintiffs also stated that the reason for their own decision not to dismiss the action pursuant to the agreement was because they "were forced to move to enforce the Settlement Agreement and are entitled to recover their attorney fees and costs for doing so under paragraph 20 of the Settlement Agreement." (*Id.*). Because of this, plaintiffs alleged, they could not dismiss the suit "with the understanding that [defendants] will comply in all respects." (*Id.*). Plaintiffs then extended defendants' deadline until Monday, November 16, 2015 to take action to rectify

---

[1] Plaintiffs have not objected to the one-day delay for receipt of the original affidavit.

the "breaches" alleged above and provide a supplemental affidavit verifying that such actions had been accomplished. (*Id.* at 6).

On November 16, 2015, defendants notified plaintiffs that there was an issue transferring the web domains, which resulted from the defendants earlier abandoning the domain names and thus no longer having access to transfer them. Defendants expressed their intent to continue working with the domain name provider to resolve this issue to plaintiffs' satisfaction. (Dkt. No. 63-2, p.8). Later that day, defendants also provided plaintiffs with the Affidavit of Tami Parris. Ms. Parris is a shareholder for some of the defendant entities and was personally involved with all aspects of compliance with the settlement agreement. With respect to plaintiffs' specifically identified complaints, Ms. Parris affirmed under oath that:  (1) as of that date, the web domain name provider was unable to transfer the abandoned Touchstone domain names; (2) all social media accounts connected to the defendant entities that used or referenced the Touchstone name had been deleted or requested to be deleted; (3) all specifically named owners, investors, shareholders, members, partners, and officers were notified of the requirement to abandon use of the Touchstone mark by telephone and e-mail on the specific dates identified in September and October 2015; and (4) that there was only one mobile application associated with the Touchstone name and that it had already been completely deleted and was no longer available for use. She also affirmed that as of that date defendants had taken all steps known to them to remove any internet connection between the defendant entities and the Touchstone name, whether that connection was within their control or under the control of third parties. (Dkt. No. 61-1, pp. 15-23).

6

Magistrate Judge Evelyn Furse granted plaintiffs' motion for leave to file their amended complaint on November 18, 2015. (Dkt. No. 55). On Friday, December 4, defendants notified plaintiffs that they had been able to repurchase several domain names associated with the Touchstone names at plaintiffs' request in order to then transfer them to the plaintiffs. They also identified that the company that had created the abandoned mobile application was now dissolved, and that accomplishing an "edit" may require resurrecting the application. (Dkt. No. 63-2, p.17). And, notwithstanding the existence of the signed written agreement and defendants' significant and ongoing efforts to cooperate and comply with the material terms of the agreement, on this same date, plaintiffs filed their Amended Complaint. (Dkt. No. 56).

Defendants moved to dismiss the Amended Complaint for failure to state a claim, citing, among other grounds, the fully executed settlement agreement as proof that no cognizable claim presented itself in the amended complaint. (Dkt. No. 61). Throughout December 2015 and January 2016, the parties continued to communicate regarding the status of compliance with the settlement agreement, with plaintiffs complaining that there were still problems with the domain name transfers, problems with permanent deletion of social media accounts, and problems with the abandoned mobile app not having been modified to remove the Touchstone mark. Defendants, for their part, identified that their inability to transfer the final remaining repurchased domain name was due to plaintiffs' own internal transfer of responsibility for this task to another department without notifying defendants. They further identified that to their understanding, all social media accounts formerly associated with the defendants' entities were no longer in use and that deletion had been requested. And finally, they again reiterated that the mobile application had been deleted, that any previously downloaded copy of the application

leads nowhere when opened, and that it can no longer be purchased. Finally, they complained

that notwithstanding defendants' efforts to substantially comply with the parties' agreement,

plaintiffs still failed to dismiss their claims. (Dkt. No. 63-2, pp. 17-29).

At oral argument on the parties' motions, plaintiffs stated that they had not dismissed

their claims against defendants because of outstanding compliance issues. Now, plaintiffs

claimed, these issues relate primarily to the elimination of any internet reference to defendants'

former affiliation with the Touchstone mark, even by third party websites or accounts not within

defendants' control. Defendants responded that due largely to third parties having control of

content, there has been unforeseen difficulty involved in ridding the internet of any trace of their

former association with the Touchstone name, and in any event that they had materially

complied with the settlement agreement and any alleged ongoing non-compliance was not

intentional.

The court ordered that plaintiffs identify all internet sites, web pages, social media

content, or other electronic data of which they were aware that allegedly breaches the parties'

settlement agreement by June 1, 2016, and that thereafter defendants should conduct their own

search for infringing content (with expert assistance if necessary), remove all infringing content

identified by either party, and provide a sworn statement specifically identifying their

compliance or all efforts taken in pursuit of such compliance by June 15, 2016. The court then

authorized plaintiffs to provide a response to this statement within seven days thereafter. Both

motions were taken under submission until the completion of these steps. (Dkt. No. 67).

The parties complied with the court's order. Plaintiff submitted a number of instances of

allegedly non-compliant internet content referencing defendants' prior association with the

Touchstone mark that are primarily controlled by third parties, including SuperPages and Yellow

Page listings, AMFIBI listings, Bing and other local listings, Yelp and Better Business Bureau

reviews, and listings on Dun & Bradstreet, Merchant Circle, Chamber of Commerce, White

Pages, Cortera, Buzzfile, Manta, and others, as well as on social media accounts. This case

illustrates the complexity and difficulty of removing all traces of any reference to names,

pictures and purported facts once information is published to the internet. Plaintiffs also

continued to complain about a previously downloaded copy of the abandoned mobile application

that displays a Touchstone mark, although it does not function and leads nowhere. (Dkt. No. 68).

Defendants hired an expert who specializes in internet marketing, brand reputation

management, and web development to assist them in removing content over which they had

insufficient control. The expert, Nathan Hawkes of Arcane Marketing, LLC, provided a sworn

statement that even experts in this area have difficulties associated with complete removal of

unwanted information from the internet for reasons including:  (1) lack of access to alter, change,

or delete information completely controlled by third parties; (2) storage of online information on

servers outside of the United States; (3) lack of options to delete, as opposed to edit, offered by

third party organizations responsible for posting online data; and (4) delay in search engine index

updates lasting from sixty to ninety days after online content has been deleted or edited. Mr.

Hawkes provided detailed information and timelines about his and his staff's efforts to remove

content referenced by the plaintiffs as well as any additional Touchstone references associated

with defendants that they could independently locate. With specific reference to the mobile

application, Mr. Hawkes researched the mobile application and determined that it is no longer in

existence. Defendants anticipated that some of Mr. Hawkes' efforts to eliminate unwanted and

largely third-party content would not be apparent until after the next search engine index update. (Dkt. No. 69).

In response to defendants' report, plaintiff requested an additional 75 days to provide the court with a status report on the success of defendants' efforts. The court granted plaintiff's request. The plaintiff asserted that 53 instances of "infringing content" remained as of August 16, 2016.  (Dkt. No. 72). The court now rules on the motions.

## I.      JURISDICTION AND CHOICE OF LAW

The court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the lawsuit involves claims brought under federal trademark laws, including 15 U.S.C. §§ 1114 and 1125. The parties now ask the court to address issues related only to the settlement of these claims. The court retains jurisdiction over this matter because judgment has not been entered nor has the case been dismissed. *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 381 (1994) (a court does not lose jurisdiction over enforcement of a settlement agreement before judgment is issued or a case is dismissed); *see also United States v. Hardage*, 982 F.2d 1491, 1496 (10th Cir. 1993) (while the litigation is still pending before it, a trial court has the power to enforce a settlement agreement).

Determining the existence of and enforcing a settlement agreement are legal issues governed by state contract law. *Shoels v. Klebold*, 375 F.3d 1054, 1060 (10th Cir. 2004). There is clear evidence that by August 2015 the parties agreed to a forum selection provision that Ohio law should govern the "construction, validity, and performance" of the settlement agreement, notwithstanding defendants' later request that plaintiffs consider substituting Utah as the forum.

(Dkt. No. 61-1, p. 9). Accordingly, the court will apply Ohio contract law to address all issues related to enforcement of the settlement agreement.

Furthermore, although the same "Governing Law and Jurisdiction" provision also provides that "[t]he Parties agree that the sole and exclusive jurisdiction and venue for any such suit shall be in a state or federal court located in Hamilton County, Ohio," *Settlem. Agrmt. and Mutl. Release*, ¶ 22, the court finds that the plaintiffs, who insisted on this forum selection clause, have waived it by continuing to argue for relief in this court after the parties reached a settlement in August 2015. *See Gordon Flesch Co. v. Sherrod*, 2012 Ohio Misc. LEXIS 6153 (Ohio C.P. April 11, 2012) (forum selection clause can be waived by a plaintiff who seeks relief in a forum other than the one specified in a contract). Accordingly, the court next turns to the motion to enforce the settlement agreement.

## MOTION TO ENFORCE SETTLEMENT AGREEMENT

At oral argument, the parties both admitted that a valid settlement agreement exists and has existed since August 2015. That concession renders plaintiff's original motion for the court to find the existence of a settlement agreement moot. While this is so, resolution of the remaining issues in this case requires the court to determine whether defendants' September 9, 2015 request that plaintiffs consider re-negotiating three changes to the agreement constituted a repudiation or breach of the August 2015 agreement. The court holds that it does not.

### A. Defendants' Modification Request Was Not An Anticipatory Breach or Repudiation of the Contract

Under Ohio law, "[a]n anticipatory breach of contract by a promisor is a repudiation of the promisor's contractual duty before the time fixed for performance has arrived." *Southeast Land Dev., Ltd. v. Primrose Mgmt., LLC*, 952 N.E.2d 563, 568 (Ohio Ct. App. 2011). For an

anticipatory breach to occur a party must clearly and unequivocally repudiate the contract. *Sentinel Consumer Prods. v. Mills, Hall, Walborn & Assocs.*, 673 N.E.2d 967, 970 (Ohio Ct. App. 1996). Repudiation of a contract requires more than "[a] mere request for a change in terms." *McDonald v. Bedford Datsun*, 570 N.E. 2d 299, 301 (Ohio Ct. App. 1989). Repudiation can be established by "failing to give adequate assurance of performance." *Fifth Third Processing, Solution, LLC v. Elliott,* 2011 U.S. Dist. LEXIS 120216 *12 (S.D. Ohio Oct. 18, 2011). On the other hand, performance under the contract signals acceptance and intent to be bound by the terms of the contract. *Power Mktg. Direct, Inc. v. Pagnozzi*, 2006 U.S. Dist. LEXIS 73343 **8-9 (S.D. Ohio Sept. 29, 2006). Finally, when the parties have already agreed to the terms of a settlement, assent is not withdrawn "simply because not all parties have signed it." *See Miller v. Prompt Recovery Servs.*, 2014 U.S. Dist. LEXIS 118568 *4 (N.D. Ohio Aug. 25, 2014).

With these principles in mind, the court finds that defendants' September 9, 2015 request for a change in terms was not sufficient to establish a clear and unequivocal repudiation of the contract the parties admit has been enforceable as of August 12, 2015. Their request was void of any statements to suggest defendants denied the existence of an agreement or did not intend to be bound by it when their first obligations became due on November 1, 2015. Furthermore, on September 10, the day after plaintiffs rejected defendants' proposed terms and threatened further litigation, defendants immediately provided assurance of their performance under the contract by, first, submitting the paperwork abandoning the Touchstone name in the names of defendants' Utah business entities; second, identifying that paperwork was in the process of being prepared to abandon the Touchstone name for the non-Utah business entities; third, identifying that the websites were in the process of being changed; and fourth, overtly stating that defendants were

making a "good faith effort to make the material changes contemplated by the agreement we are negotiating" and that Mr. Lee was "not interested in protracting this litigation and has every intent to make the name changes as indicated." (Dkt. No. 50-2, pp. 62-63).

Even if plaintiffs incorrectly believed that a signature was required to create or enforce the contract formed on August 12, 2015, defendants' immediate performance of the key material term abandoning the Touchstone name in their businesses should have signaled their acceptance and intent to be bound by the agreement, notwithstanding their inquiry about modifying its terms. Furthermore, plaintiffs' acceptance of this performance also bound them to the agreement. *See Power Mktg. Direct,* 2006 U.S. Dist. LEXIS 73343 at **8-9 ("parties may become bound by the terms of a contract, even though they do not sign it, where their assent is otherwise indicated, such as by the acceptance of benefits under the contract, or the acceptance by one of the performance by the other."). To the extent that plaintiffs' arguments imply that defendants' September 10, 2015 performance was insufficient to satisfy them of the existence of the agreement, Ohio law prohibits a party who accepts the benefits of a contract from "inconsistently claiming no contract." *See Ragen v. Hancor, Inc.*, 920 F. Supp. 2d 810, 839 (N.D. Ohio 2013). *See also National City Bank v. Erskine & Sons, Inc.*, 110 N.E.2d 598, 603 (Ohio 1953) (breach of contract may be inferred from a party's refusal to "recognize the existence of a contract" or doing "something inconsistent with its existence," neither of which is the case here). Under Ohio law, plaintiffs were incorrect to assume that after an agreement had been reached, whether by verbal assent on August 12, 2015 (which all parties agree is the case), or by performance on September 10, 2015, that defendants had withdrawn their agreement simply because they had not yet signed the written agreement.

**B.  Defendants Did Not Breach the Contract Prior to Plaintiffs' Filing of a Motion to Enforce**

Because plaintiffs have not established an anticipatory breach of the settlement agreement, the court must next consider whether there was any other breach of the settlement agreement prior to the plaintiffs' filing of a motion to enforce. "A settlement agreement is subject to enforcement under standard contract law." *Consolo v. Menter*, 2011-Ohio-6241, ¶ 11 (Ohio Ct. App. 2011). In Ohio, once the existence of a settlement agreement has been demonstrated, a breach of contract can be found to occur when "the nonbreaching party performed its contractual obligations; the other party failed to fulfil its contractual obligations without legal excuse; and the nonbreaching party suffered damages as a result of the breach." *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1266 (Ohio Ct. App. 1996). The only damages alleged by plaintiffs are their attorneys' fees, which the court addresses below. As for whether plaintiffs were a nonbreaching party when they filed for relief, the court begins by noting that plaintiffs had the first obligation due under the agreement. This obligation is stated as follows:

> Dismissal of Civil Action. Within ten (10) business days of all Parties executing this Settlement Agreement, Plaintiffs shall file with the court in the Civil Action a Stipulation of Voluntary Dismissal of Claims with Prejudice, in a form substantially consistent with the one attached hereto as Exhibit A, with the understanding that the Defendants, the Non-Utah Entities, and Thomas H. Lee will comply in all respects with the terms of this Settlement Agreement.

*Settlem. Agrmt. and Mutl. Release*, ¶ 10.

Plaintiffs filed their motion to enforce on September 24, 2015. As of that date defendants had not yet signed the written agreement, even though all parties agree there was already an enforceable agreement in place. Written execution of the settlement document is a condition

14

precedent to the requirement for plaintiffs to dismiss the action. Thus, on September 24 plaintiffs' obligation to dismiss the action had not yet arisen and they were a nonbreaching party at the time of filing.

Turning next to the question of defendant's obligations as of September 24 when plaintiffs filed their motion to enforce, defendants' deadlines for compliance remained in the future, with the majority of defendants' deadlines scheduled to become due on November 1, 2015 and shortly thereafter. Furthermore, defendants had already begun to perform on the contract by September 24. Considering these facts, the court cannot find that defendants had breached the settlement agreement before plaintiffs filed their motion to enforce.

### C.  Plaintiffs Were First to Breach the Contract Without Legal Excuse

On the other hand, while their motion to enforce was pending, plaintiffs breached the settlement agreement without legal excuse by failing to dismiss this civil action by October 22, 2015, ten business days after all parties had executed the written settlement agreement on October 8, 2015. *See Settlem. Agrmt. and Mutl. Release*, ¶ 10. Written execution of the settlement document was the only condition precedent to the requirement for plaintiffs to dismiss the action. Nevertheless, plaintiffs argue that they are justified in refusing to dismiss the action because defendants delayed affixing their signatures to the agreement, which meant that plaintiffs did not have an "understanding" that defendants would "comply in all respects" with the agreement. (Dkt. No. 63-2, p. 24).

The court is not persuaded by this argument. As discussed previously, defendants' signature was not required to establish the existence of the agreement either under Ohio law or under the terms of the agreement itself. Even if plaintiffs believed a signature were required,

defendants signed the agreement on October 8, 2015, which triggered plaintiffs' obligation to dismiss the case by October 22, 2015. By their September 10 performance, defendants had already assured plaintiffs of their intent to comply with the material terms of the agreement; by their subsequent signatures on the written document, defendants gave plaintiffs no reason to assume by October 22, 2015 that defendants would not "comply in all respects."[2] Therefore, plaintiffs had no legal excuse for their failure to dismiss the action and that failure constitutes the first breach of the agreement.[3]

---

[2] Plaintiffs also argue that they are justified in refusing to dismiss the action because defendants had not complied in all respects with an attorneys' fees provision under paragraph 20 of the agreement. They argue that defendants' delay in signing the agreement triggered the attorneys' fee provision such that payment of these fees was required for defendants to "comply in all respects" with the agreement before plaintiffs had a duty to dismiss the action. (Dkt. No. 63-2, p. 24). Paragraph 20 reads as follows:

> Remedies for Breach of Settlement Agreement. The Parties expressly covenant and agree that, in the event that the Defendants, the Non-Utah Entities, and/or Thomas H. Lee breaches this Settlement Agreement, Plaintiffs shall be entitled to recover from the breaching party its attorneys' fees and costs in a suit or other proceeding to enforce this Settlement Agreement.

As previously explained, however, plaintiffs are incorrect that defendants' delay in signing the written document repudiated or breached the parties' agreement or rendered it unenforceable either by the terms of the agreement or under Ohio law. *See National City Bank*, 110 N.E.2d 598 at 603 (an inference of breach of contract is not established where a party does not deny the existence of an agreement or take actions inconsistent with the agreement). Thus, the attorneys' fees provision of paragraph 20 was not triggered. Plaintiffs are also incorrect that the agreement required defendants to comply in all respects with the terms of the agreement *before* plaintiffs had an obligation to dismiss the action. To the extent that plaintiffs' "understanding" that defendants intended to comply with the agreement was shaken by the alleged delay in obtaining their signatures, defendants' September 10 performance of material terms of the agreement should have rehabilitated their understanding. Thus, this argument fails as a justification for plaintiffs' failure to dismiss.

[3] Given plaintiffs' pending motion before this court at that time, such dismissal could have included language preserving the court's jurisdiction to later enforce the settlement agreement should it become necessary, *see Kokkonen*, 511 U.S. at 381-82, or it could have been an outright dismissal with plaintiffs pursuing an enforcement action, if any, in Ohio per the forum selection clause. Either way, plaintiffs' failure to dismiss is a breach of the settlement agreement.

**D.  Defendants Did Not Breach Essential Terms of the Contract Such That
     Plaintiffs' Obligations Under the Contract Were Discharged**

The court finds that defendants did not breach a material term of the parties' agreement

after their obligations arose beginning November 1, 2015. Thus, plaintiffs' obligations to dismiss

the civil action have not been discharged. Ohio law identifies five factors the court can consider

in determining whether a party has violated an essential term of an agreement:  (1) the extent to

which the injured party will be deprived of the benefit of the bargain; (2) the extent to which the

injured party can be compensated for the lost benefit; (3) the extent to which the breaching party

suffers a forfeiture; (4) the likelihood that the breaching party can cure its breach under the

circumstances; and (5) the extent to which the breaching party has acted in good faith and has

dealt fairly with the injured party. *Dixon v. Northridge,* 2008-Ohio-2744, ¶ 36 (Ohio Ct. App.

2008) (citing *Software Clearing House, Inc. v. Intrak, Inc.*, 583 N.E.2d 1056, 1060 (Ohio Ct.

App. 1990). The court evaluates each breach alleged by defendants by the applicable standard(s).

   1.   Affidavit and November 1 Notice of Abandonment.

The agreement's requirement for an affidavit verifying defendants' abandonment of the

Touchstone mark begins as follows:

> On November 2, 2015, each of the Defendants, the Non-Utah Entities, and
> Thomas H. Lee, or someone authorized to testify on their behalf, shall provide
> Touchstone with an affidavit (or affidavits) swearing under penalty of perjury that
> they have fully satisfied their respective obligations to abandon any use of the
> Touchstone Marks, as set forth in Paragraphs 1, 2, 3, 4, and 5 of this Settlement
> Agreement, detailing all steps taken to accomplish their compliance and attesting
> that they have, among other things . . .

*Settlem. Agrmt. and Mutl. Release*, ¶ 7.

The paragraph goes on to reference the requirements set forth in other paragraphs of the

agreement. In its reference to paragraph 5 of the agreement, which requires that defendants give

17

notice by November 1, 2015 to their "owners, investors, shareholders, members, partners, and officers" that the Touchstone mark is being abandoned and its use must cease, the affidavit provision adds a requirement that the notified individuals, and the date and means of notification, must be identified in the affidavit. The court finds plaintiffs' claims that defendants breached the affidavit requirements, particularly those related to paragraph 5 of the agreement, are non-material quibbles. Nothing in the agreement required that the affidavit be provided by someone personally involved in the tasks of compliance. Similarly, nothing in the agreement suggested plaintiffs' unilateral interpretation that a sworn statement of belief or understanding that contract obligations had been satisfied was unacceptable. Finally, nothing in the agreement specified that the notified individuals must be named personally rather than identified by category, which is an equally viable interpretation of the provision.[4]  In any event, defendants cured the deficiencies perceived by plaintiffs' interpretation of the affidavit provision and acted in good faith by providing a supplemental affidavit by Tami Parris, who was personally involved in the tasks of compliance, and individually naming the notified owners and shareholders and supplying additional information about which of them received notice by telephone as opposed to e-mail. Plaintiffs received the benefit of their bargain.

2.  <u>Website domain names</u>.

The parties' agreement is that defendants first abandon their use of website domain names using the Touchstone name no later than November 1, 2015, and in furtherance of that abandonment, transfer the domain name to plaintiffs. *Settlem. Agrmt. and Mutl. Release*, ¶¶ 1-3.

---

[4] The provision indicated that the affidavit should attest that defendants "provided notice to all applicable owners, investors, shareholders, members, partners, and officers of the cessation of the use of the Touchstone Marks, identifying the individuals who were notified, the date that they were notified, and the means by which they were notified." *Settlem. Agrmt. and Mutl. Release*, ¶ 7.

An affidavit verification of compliance is then required. *Id.* at ¶ 7. Neither party disputes that defendants abandoned use of the Touchstone website domain names by November 1, 2015. In light of plaintiffs' threat of further litigation after the parties had reached an enforceable settlement agreement, the court cannot find that defendants acted in anything but good faith by rushing to abandon use of the website domain names on September 10 to demonstrate their willingness to comply with material terms of the parties' agreement. It appears that this rush, however, led to the unintended consequence of defendants subsequently not owning the domain name to make a transfer of them to plaintiffs on the November 1 deadline. Defendants were also forced to spend a significant amount of time responding to plaintiffs' pleadings after September 24 during the period in which they could have otherwise have focused entirely on compliance. Since then, at their own expense, defendants have repurchased the domain names and transferred them to plaintiffs. The court finds that the delays in accomplishing this task were due to the actions of both parties, both before and after the domain names were repurchased. Defendants' affidavits accurately identified the actions taken. The court finds that defendants dealt fairly and in good faith with plaintiffs under these circumstances and that plaintiffs have received the benefit of their bargain.

3. Mobile Application.

The parties' agreement is that defendants first abandon their use of any mobile application using the Touchstone name or mark no later than November 1, 2015, and in furtherance of that abandonment, modify and update any mobile applications offered with such marks so as to remove the Touchstone mark from all aspects of such applications. *Settlem. Agrmt. and Mutl. Release*, ¶¶ 1-3. An affidavit verifying compliance is then required. *Id.* at ¶ 7.

The parties do not dispute that defendants abandoned and discontinued use of the only mobile application it had that referenced the Touchstone mark and appropriately notified plaintiffs of this fact by affidavit. The court finds plaintiffs' continued objection unreasonable, namely, that in furtherance of that abandonment, defendants must "modify" and "update" the discontinued and non-functioning application to eliminate the Touchstone name. The court finds that by discontinuing the ongoing functionality of this mobile application and withdrawing it from offer in all places where it can be downloaded, defendants have provided plaintiffs with the benefit of their bargain. Furthermore, in response to plaintiffs' continued objection that previously downloaded copies of the non-functioning application still show the Touchstone mark, defendants have acted in good faith by exploring whether modification of the defunct application is nonetheless still possible. The court finds that the dissolution of the company that developed the application renders modification unreasonable, particularly because defendants have abandoned use of, offer of, and association with the mobile application.

The court finds that the modification requirement in the contract, because it was specified as an action to be taken "in furtherance" of the primary requirement to abandon use of the Touchstone mark, was a remedy anticipated in the event that the mobile application would continue in use under defendants' new company names. Nothing in the agreement required that the defendants choose to continue using this or any other mobile application under a different name. The court is unpersuaded by plaintiffs' arguments that the agreement requires an abandoned and nonfunctioning mobile application to nevertheless be modified. Plaintiffs received the benefit of their bargain when defendants discontinued the mobile application and ceased to offer it at any location where it could be downloaded.

4.   <u>Social Media Accounts and Elimination of Internet Presence</u>.

The parties' agreement is that defendants abandon their use of social media accounts connected to the Touchstone name no later than November 1, 2015, and in furtherance of that abandonment, delete all social media accounts utilizing any of the Touchstone marks. *Settlem. Agrmt. and Mutl. Release*, ¶¶ 1-3. An affidavit verification of compliance is then required. *Id.* at ¶ 7. In addition, a separate paragraph addresses a November 1, 2015 requirement to eliminate defendants' internet presence related to Touchstone marks, which includes (1) removing any reference to Touchstone marks from websites under defendants' control (including a designated but non-exclusive list of websites); (2) "take all steps necessary to take down from any website they do not control" any reference to Touchstone marks associated or affiliated with defendants; and (3) "hereafter assist Plaintiffs however necessary, and at his own cost, to remove any additional vestiges on the Internet, or in social media, or in other digital or non-digital formats" any reference to Touchstone marks associated or affiliated with defendants. *Settlem. Agrmt. and Mutl. Release*, ¶ 4.

At the outset, the court notes that the settlement agreement explicitly anticipates that after deleting the businesses' Touchstone-related social media accounts and taking all the steps they could to remove Touchstone-related content from websites both controlled by them and controlled by third parties, "additional vestiges" of Touchstone marks associated and affiliated with defendants would continue to need monitoring and removal. *Id.* The court finds that the parties' anticipation of this fact defeats plaintiffs' claim that defendants breached these terms of the contract.

The November 16, 2015 Affidavit of Tami Parris identifies that the businesses' social media accounts, including Facebook, Twitter, Pinterest, Flickr, Instagram, Tumblr, and various blogs, were deleted or deletion requests were made. Although plaintiffs subsequently complained that defendants had not deleted such accounts, the record did not initially reveal any details to support plaintiffs' assertions. *See, e.g.*, Dkt. 63-2, p. 23. Ms. Parris' affidavit also certified that

> Any website referencing the name Touchstone over which the entities have control has been deleted. At this point in time there may be third party sites making the connection between the name Touchstone and the defendant entities. The defendant entities have taken all known steps at this point to remove any connection to the Touchstone name.

*Affidavit of Tami Parris*, Dkt. No. 61-1, ¶ 20.

Although the plaintiffs' motion to enforce did not initially claim that Ms. Parris' assertion was incorrect, at oral argument plaintiffs introduced this claim and provided several examples demonstrating the existence of largely third-party internet sites making connections between defendants and the Touchstone mark. Because there was insufficient evidence for the court to evaluate whether the social media and internet presence terms had been materially breached, the court ordered plaintiffs to identify with specificity any ongoing infringing social media and internet presence. For the sake of fairness given the court's authorization for plaintiffs to supplement the record, the court also authorized defendants to make their own efforts to both identify and clean up content alleged to constitute a breach of the agreement.

Upon review of both parties' supplemental information, the court did not find any of defendants' Touchstone-referencing business social media accounts still in existence. Of twelve specifically identified social media pages allegedly breaching the parties' agreement, nine were attributable to the failure by Michael Gibbons, a shareholder and manager of the defendants'

Springville location, to modify all instances of the word "Touchstone" or a photo of the former "Touchstone Financial" signage in profile and other sections of his personal and group Twitter, Facebook, Pinterest, LinkedIn, Foursquare, and Google Plus pages. With the exception of the Pinterest account, which did not have any content and appeared to have been an account established only for the purpose of viewing other Pinterest pages, Mr. Gibbons' social media accounts all showed evidence of modifications reflecting good faith efforts at compliance as early as September 10, 2015. One LinkedIn account referenced by plaintiffs is owned by a former employee. One Google Plus reference to the Touchstone mark was a review written by a former customer. The last account referenced was that of another owner, Danny Gibbons' LinkedIn page, which also showed evidence of good faith efforts to comply with the change in the company's name. For their part, defendants specifically identified their experts' efforts to search, delete, and/or modify (where deletion was impossible) all vestigial social media content identified by plaintiffs and themselves, and noted that as to customer reviews and former employees, defendants had no ability or access to control that content.

The court finds that these few social media references, which showed evidence of compliance efforts, have not deprived plaintiffs of the benefit of their bargain. Additionally, there is clear evidence that defendants' expert has or will have completely cured future references to Touchstone on defendants' social media accounts except where a few customers or a former employee reference their interactions with defendants when they were known under the Touchstone name. Plaintiffs have not shown how such limited references have damaged or will damage them. Accordingly, the court finds that there is no breach of an essential term because

defendants have acted with good faith and dealt fairly with plaintiffs with respect to the social media accounts.

As for the "elimination of internet presence" provision, there is no question for the court that the third-party references identified by plaintiffs and defendants' expert constitute the "additional vestiges" anticipated by the parties' agreement. Defendants' expert outlined in careful detail his elimination of many such "vestiges" and his efforts and anticipated success in eliminating the remaining "vestiges." Plaintiffs' second supplemental response showed that defendants' expert was largely successful, reducing alleged vestigial references identified by plaintiffs from 119 to 37 and reducing alleged vestigial references identified by defendants from 64 to 15.[5]  (Dkt. No. 72). The court further notes that the agreement's term "additional vestiges" contemplates the reality that defendants' compliance with this provision cannot be perfect, and finds it unreasonable for plaintiffs to require defendants' perfection in removing third-party content prior to undertaking their own obligations under the agreement. Therefore, the court cannot find that plaintiffs have been deprived of the expected benefit of their bargain. Rather, the court concludes that defendants are not willfully or wrongfully maintaining an internet presence using plaintiffs' mark and specifically finds that defendants' efforts, which have been made at their own expense, are reasonably likely to cure any "vestiges" remaining. Defendants have acted with good faith and dealt fairly with plaintiffs.

---

[5] The court notes that plaintiffs appear to have overstated the remaining count of allegedly infringing content by including websites upon which the court can find no trace of infringing material or where the site itself identifies that the "Touchstone" business is closed. The court anticipates that a further number of allegedly infringing third-party sites appear posed to drop off this supplemental list shortly based on its review of actions taken by defendants' expert on similar sites that have already dropped off the list.

### E.  Attorneys' Fees

The record reveals that each party's agreement to bear their own costs and attorneys' fees was a material term of the settlement, although a reluctant one on plaintiffs' part. (Dkt. No. 50-1, p. 5). Plaintiffs now claim that the court should award them attorneys' fees for a breach of the settlement agreement upon a finding that defendants acted in bad faith or, as previously discussed, on the basis of the attorneys' fees provision in paragraph 20 of the settlement agreement.

### 1.  Bad Faith

Under Ohio law, bad faith "is more than bad judgment or negligence." *Covenant Dove Holding Co., LLC v. Mariner Health Care, Inc.*, 2013-Ohio-3824, ¶ 7 (Ohio Ct. App. 2013). "It implies a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty due to ulterior motive, ill will comparable to fraud, or an actual intent to mislead or deceive another." *Id.* "A party seeking attorney fees based on . . . bad-faith . . . 'must be the prevailing party in the litigation, and then must prove that his opponent acted in bad faith.'" *Id.* (quoting *Strum v. Strum*, 590 N.E.2d 1214 (Ohio 1991)). In light of the court's findings that defendants did not deny the existence of the August 2015 settlement agreement, did not repudiate the agreement by asking for modifications in September 2015, performed the material terms of the agreement in September, October, and November 2015, did not breach essential or material terms of the agreement thereafter, and acted in good faith and dealt fairly with plaintiffs to subsequently cooperate with plaintiffs' demands, the court cannot find that plaintiffs are the prevailing party in

the litigation nor that defendants acted in bad faith.[6]  Furthermore, the court has found that

plaintiffs, not defendants, are in material breach of the agreement. All of the foregoing precludes

plaintiffs' request for an award of attorneys' fees on the grounds of bad faith.

2.  Attorneys' Fees Under Paragraph 20.

Plaintiffs cite *Hitachi Med. Sys. Am. v. Livingston MRI, LLP*, 2010 U.S. Dist. LEXIS

32084, at *8 (N.D. Ohio Apr. 1, 2010) and *Kilroy v. Peters*, 2013-Ohio-3384, ¶ 3, 2013 Ohio

App. LEXIS 3461 (Ohio Ct. App. Aug. 2, 2013) for the proposition that Ohio courts routinely

award attorney fees to parties "who must move to enforce the agreement against their party-

opponent" when there is provision for such an award in a settlement agreement. (Dkt. No. 54, p.

4). Plaintiffs further allege that defendants' failure to sign the settlement agreement forced them

to "seek the Court's assistance in enforcing the Settlement Agreement," similar to the situations

in both *Hitachi* and *Kilroy*. *Id.* The court disagrees that the cases are analogous. In *Hitachi*, a

defendant attempted to avoid a settlement agreement by arguing that he lacked authority to enter

---

[6] The court is not persuaded by plaintiffs' representation that *Tocci v. Antioch Univ.*, 967 F. Supp.2d
1176, 1202 (S.D. Ohio 2013) is an analogous case that the court should consider in finding defendants
have similarly acted in bad faith to support an attorneys' fees award. The facts of that case reveal that the
day after settlement was reached with the assistance of a mediator, Tocci requested modifications to the
agreement including demands that the University affirmatively deny that Tocci was to blame for any
actions that led to their dispute and commend and/or thank him for his patience and mediation skills. He
then demanded changes in how the agreed-upon terms were worded to reflect more favorably upon him.
When the University declined these requests and requested that Tocci sign the agreement actually
reached, Tocci threatened further litigation including a $1.3 million demand for damages on the grounds
that the University's refusal to make his changes meant that it was not in compliance with the agreement.
Similar threats and demands continued for an additional month, at which time Tocci began denying the
existence of an agreement. At an evidentiary hearing on the University's motion to enforce, Tocci
testified that the terms he agreed to were substantially different than those testified to by the mediator and
the University. At no time did he affirm his intent to be bound by the material terms of the agreement or
perform the material terms of the contract. While the Ohio court found Tocci's behavior to be in bad faith,
Tocci's behavior is not at all analogous to defendants' behavior here, who requested changes to the
agreement once, never denied that an agreement had been reached, affirmatively stated their intent to be
bound, performed the material terms of the contract before signing the contract, and signed the contract as
written by plaintiffs.

into the agreement. 2010 U.S. Dist. LEXIS 32084 at *5. In *Kilroy*, defendants attempted to escape their obligations under an agreement because it was oral, the written agreement had not been executed, defendants alleged they did not "intend to be bound by an agreement until formalized in a written document signed by both sides," and on the grounds that execution or approval of an agreement required "voting and passing a resolution approving an agreement in an open meeting." 2013-Ohio-3384 at ¶ 16.

    As discussed previously, here, unlike *Hitachi and Kilroy*, defendants did not deny the existence of an agreement and have never attempted to avoid their obligations under the agreement. Defendants' performance of the material terms of the agreement on September 10, 2015, alone, demonstrates that plaintiffs were not "forced" to seek the court's assistance to enforce the agreement, because their performance indicated either acceptance or assurance under the contract, or both. Furthermore, as discussed above, by September 24 the defendants had not breached the agreement such that plaintiffs were "forced" to seek the court's assistance. Finally, the court's finding herein that defendants did not subsequently breach the agreement on its essential terms precludes plaintiffs from an award of attorneys' fees under this provision. Plaintiffs' motion to enforce, including a request for attorneys' fees, is thus DENIED in its entirety.

## MOTION TO DISMISS AMENDED COMPLAINT

    The court finds that plaintiffs' amended claims are moot because the parties both agree that a valid settlement agreement was entered into on August 12, 2015 regarding the facts and causes of action alleged in plaintiffs' Complaint, and as to all parties, facts, and causes of action alleged in plaintiffs' First Amended Complaint. "Under Ohio law, a settlement agreement is a

contract designed to terminate a claim by preventing or ending litigation." *Newman v. Canyon Med. Ctr.*, 2014 U.S. Dist. LEXIS 113579 *5 (S.D. Ohio Aug. 15, 2014) (internal quotations omitted) (quoting *Kohus v. Graco Children's Prods., Inc.*, 13 F. Supp. 3d 829, 834 (S.D. Ohio 2014). The parties' intent regarding contract terms such as dismissals and mutual releases is "presumed to reside in the language they choose to employ in their agreement." *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997). As previously discussed, paragraph 10 of the agreement contains a term requiring plaintiffs to dismiss the civil action upon the condition of defendants signing the settlement agreement. The parties' settlement agreement also provides that plaintiffs should release their claims against defendants as follows:

> Subject to, and in consideration of, the mutual releases set forth herein; the agreements of the Defendants, the Non-Utah Entities, and Thomas H. Lee to abandon the Touchstone Marks by November 1, 2015 and their fulfillment of all such terms as set forth in Paragraphs 1, 2, 3, 4, 5, and 6 of this Settlement Agreement; and all other covenants included in this Settlement Agreement, Plaintiffs . . . do hereby fully and forever surrender, release, acquit, and discharge the Defendants . . . from any and all claims, demands, actions, causes of action, damages, attorney fees, costs, expenses, debts, covenants, promises, agreements, and controversies of whatsoever kind and/or nature, at law and/or in equity, whether known or unknown, that were asserted or could have been asserted in the Civil Action, that arise out of or relate to the subject matter of the Civil Action, or that relate in any way to the Touchstone Marks.

*Settlem. Agrmt. and Mutl. Release*, ¶ 11.

The court has rejected each of plaintiffs' arguments denying that their duty to dismiss had arisen. The court has also found that defendants have materially complied with the agreement. Thus, the court finds that dismissal is required both by paragraph 10 and the mutual release language cited above. The mutual release is broad enough to contemplate covering the facts, causes of action, and defendants in plaintiffs' Amended Complaint. *Newman*, 2014 U.S. Dist.

LEXIS 113579 at *6 ("[B]roadly-worded releases are generally construed to include all prior conduct between the parties.") (internal quotations omitted). Accordingly, the court GRANTS defendants' motion to dismiss the First Amended Complaint on these grounds and does not consider the alternative grounds asserted in defendants' motion.

## CONCLUSION

For the foregoing reasons, the court DENIES plaintiffs' motion to enforce the settlement agreement and GRANTS defendants' motion to dismiss the Amended Complaint. The complaint is dismissed and the clerk of court is directed to close the case.

DATED this 9th day of September, 2016.

BY THE COURT:

Clark Waddoups
United States District Court Judge